S. & F. Corporation, Plaintiff, *v.* Robert G. Wasmer, as Sheriff of County of Onondaga, Defendant.

Supreme Court, Special Term, Onondaga County, July 18, 1949.

*Phillip T. Young* for plaintiff.

*William H. Bowers*, District Attorney (*Frank Delvecchio* of counsel), for defendant.

Searl, J. Plaintiff herein is a domestic corporation and engaged in selling, distributing and operating certain devices throughout the State of New York, and particularly at Suburban Park, in the town of Manlius, Onondaga County, New York. The defendant is Sheriff of the County of Onondaga and the law enforcement officer in the county. The action seeks to perman-

ently restrain the defendant and all other law enforcement officers from interfering with, seizing, or confiscating certain amusement devices owned by the plaintiff and, the action being on the equity side of the court, seeks a temporary injunction against such interferences until the trial of the action and until the court can determine whether or not the amusement devices known as " Pokerino " do or do not violate section 982 of the Penal Law of the State of New York. The section referred to is entitled " Keeping slot machines or devices " and provides that it is unlawful:

" (a) to manufacture, own, store, keep, possess, sell, rent, lease, let on shares, lend or give away, transport * * * or to permit the operation of * * * any slot machine or device as hereinafter defined;

" (b) to make or permit to be made with any person any agreement with reference to any slot machine or device, as hereinafter defined, pursuant to which the user thereof, as a result of any element of chance or other outcome unpredictable to him, may become entitled to receive any money, credit, allowance, or thing of value or additional chance or right to use such machine or device, or to receive any * * * allowance or thing of value."

Then the statute, by way of definition, provides: " Any machine, apparatus or device is a slot machine or device within the provisions of this section if it is one that is adapted, or may readily be converted into one that is adapted, for use in such a way that, as a result of the insertion of any piece of money or coin or other object such machine or device caused to operate or may be operated, and by reason of any element of chance or of other outcome of such operation unpredictable by him, the user many receive or become entitled to receive any piece of money, credit, allowance or thing of value, or any check, slug, token, or memorandum, whether of value or otherwise, which may be exchanged for any money, credit, allowance or thing of value * * *."

It is conceded that fifteen so-called Pokerino machines are being operated at Suburban Park, a place of amusement for men, women and children, located about ten miles easterly of the city of Syracuse. Certain proof has been given and certain photographs showing the machines received which fairly indicate the nature of the game.

It is not for this court to determine on the present application for a temporary injunction whether or not the possession

or use of these games constitutes a violation of law. It simply devolves upon this court to determine whether or not a fair question of fact or law is presented to warrant this court in protecting the property against seizure until October next, when a justice sitting in Equity Trial Term can take proof of the facts and determine the main issue.

In coming to a conclusion as to whether the court is justified in restraining the law enforcement officials from making a seizure, the court must properly consider whether or not the machines, as presently installed and constituted, provide sport or entertainment by which the player exercises skill, or whether the success of the player is regulated by chance. In other words, as decided by our court of last resort, the test of the character of the game is not whether it contains an element of chance or an element of skill, but which of the two is the dominating element. (*People ex rel. Ellison* v. *Lavin,* 179 N. Y. 164, 171.)

First let us consider the construction of the machine from a player's standpoint. The player inserts a nickel and six rubber balls about the size of a tennis ball drop into an opening in the playing board. The width of this playing board is about eighteen inches, and extends from the player about nine feet in length. The playing board is level for substantially four feet, then descends a gentle incline for substantially two or three additional feet. At the further end of the playing board are thirty-six openings, or indentations, sufficient in size to receive one of the rubber balls. They are arranged six in depth and six in width, forming, as it were, a square at the further end of the board. Above this square are designations corresponding with and demarking the meaning and significance of the thirty-six openings in the playing board. These designations are, vertically, six nines, then vertically an equal number of tens, jacks, queens, kings, and aces. The player takes one of the balls and rolls it with such speed and in the direction that he desires within his arm's length. The ball then rolls down the decline on the playing board and either drops into the opening selected or bounds to another opening, if speed or accuracy is not correct. It finally drops into one of the thirty-six openings. Then a light appears on the indicating board above, showing the player where the ball has lodged. The player then takes another of the available balls and repeats his play. He continues until he has used all of the six rubber balls. Above the machine is a prize list corresponding in a way with hands dealt or held in the game of poker, namely three of a kind, a straight, a full house, four of a kind, flush, etc., and paying cer-

tain coupons which may be exchanged for articles exhibited on the shelves located above the machine.

Referring to the leading cases as to what constitutes a gambling device, we find most of them confined to alleged violations occurring in New York City. In *Reed* v. *Littleton* (275 N. Y. 150), Chief Judge CRANE, in writing for the court, stated the general rule thus: " The court of equity has at times been called upon to enjoin the enforcement of a criminal prosecution. The rule has been firmly established that it will *not* ordinarily intervene to enjoin the enforcement of the law by the prosecuting officials (*Davis* v. *American Society,* 75 N. Y. 362; *Delaney* v. *Flood,* 183 N. Y. 323) unless under proper circumstances there would be irreparable injury, and the sole question involved is one of law   *   *   *   where a clear legal right to the relief is established   *   * * *. One reason for such a rule is the desire to preserve the separation of governmental powers."

In the present instance if the machines were seized by the Sheriff, he would then have the power of destruction. It is apparent that a large investment has here been made and irreparable injury would clearly follow if the machines were destroyed and the trial court held that their use did not violate the law. In *Scientific Mach. Corp.* v. *Simmons* (181 Misc. 960), the court held that the mere presence of some element of chance does not suffice as matter of law to render a device illegal.

So far as pinball machines are concerned, since 1936 the leading authority has been *Times Amusement Corp.* v. *Moss* (160 Misc. 930, affd. 247 App. Div. 771). Prior to this decision the commissioner of licenses of the city of New York had issued licenses permitting their use. There the insertion of a coin released for use several small balls. The manipulation of a spring lever propelled against each of the balls permitted them to be driven within a runway upward and on an inclined plane. After reaching the peak of this plane each ball would take a downward course, striking obstructions, deflecting pins and direction changers, until the ball found its way into one of the holes or rolled to the bottom in an " out " position. The court found the devices to be games of chance and not of skill.

The court held that the element of chance far outweighed that of skill.

In the recent case of *People* v. *Rivero* (190 Misc. 1050) the court followed the reasoning in the *Times Amusement Corp.* case (*supra,* at p. 1051), holding that when a ball reached the high point of a runway and would roll in " unpredictable fashion,

striking bumpers which would deflect its course,'' it was a game of chance.

We naturally look, therefore, to the line that distinguishes chance from skill. Black's Law Dictionary (3d ed., p. 835) defines games of chance as follows: '' One in which the result, as to success or failure, depends less upon the skill and experience of the player than upon pure fortuitous or accidental circumstances, incidental to the game or the manner of playing it or the device or apparatus with which it is played, but not under the control of the player. A game of skill, on the other hand, although the element of chance necessarily cannot be entirely eliminated, is one in which success depends principally upon the superior knowledge, attention, experience, and skill of the player, whereby the elements of luck or chance in the game are overcome, improved, or turned to his advantage.'' The courts have held that where dice are thrown, or cards dealt face down chance alone controls. Contrarily, skill only is required when playing chess or checkers. In a game of billiards or golf, chance enters to a great extent, yet skill predominates.

Coming now to the game in question known as Pokerino, there appears upon the playing board no obstacles, pins or projections such as appear in the pinball machines. The player controls both the speed and direction of each ball that he rolls toward the opening in the playing board. If he can propel a ball with sufficient accuracy he may escape all openings into which the ball might drop until it reaches the one in which the player intends the ball to drop. There is no reason to question that the player, if proficient, may not add sufficient '' English '' so that the ball may spin one way or the other, as in a game of billiards. There is, of course, a descending grade for a distance on the playing board which the player must consider in rolling the ball. To say, however, as a matter of fact, that chance predominates as against skill, would be to try to decide a question that should properly be determined by a trial court.

In regard to the second question, namely, that of granting a premium or prize for certain scores obtained upon the machine, this has been decided by the courts as not constituting a violation of the law, provided, of course, that the operation of the device does not constitute gambling. The prize, or premium, is not a bet or wager, as it is known in advance who is to give the premium or prize, provided the skill of the operator entitles the player to the same. (See *People* v. *Cohen,* 160 Misc. 10, 12; *People* v. *Rivero, supra.*)

It is claimed by the plaintiff and not denied by the defendant that the commissioner of licenses of the city of New York has heretofore issued licenses permitting the use of this device known as Pokerino. Clearly the issuance of such a license is in no way binding upon the courts in decisions relating to the legality of the device. However, as the commissioner, prior to the ruling of the courts that pinball machines were illegal, had issued licenses for their use, and after the court's decision as to their illegality, has refused further licensing of such machines, it must be considered that the commissioner of licenses in New York did issue licenses permitting the use of the Pokerino machine with full knowledge of the previous history pertaining to pinball machines.

In view of the fact that no prior court ruling has been found declarative of illegality in the use of the Pokerino device, it is only fair to permit the continuance of their use at Suburban Park until our Equity Trial Term in October has an opportunity to take evidence and fully consider whether or not skill or chance predominates in their use.

A temporary injunction against interference with the machines may issue.